**W. F. HOOKS, Appellant,**

v.

**Maude BROWN, Appellee.**

No. 10875.

Court of Civil Appeals of Texas.

Austin.

June 14, 1961.

Rehearing Denied July 5, 1961.

Sample & Walker, Beaumont, for appellant.

Thomas A. Wheat, J. C. Zbranek, Liberty, for appellee.

HUGHES, Justice.

Appellee, Mrs. Maude Brown, a widow, sued W. F. Hooks, appellant, to cancel a deed executed by her June 13, 1956, conveying approximately 130 acres of land in Liberty County to appellant, a bill of sale dated July 25, 1956, by which she sold and transferred to appellant all cows and calves owned by her in Liberty County and all of her household furnishings, an instrument transferring to appellant her registered cattle brand, 7 H 7 C, a release of a vendor's lien retained by her in the June 13, 1956, deed, which release she executed March 20, 1959, and a quitclaim deed executed by her November 5, 1956, to appellant quitclaiming her interest in a 40.6 acre tract described in the deed of June 13, 1956. She also sought recovery of damages for rental value of the land and for conversion of cattle.

The grounds upon which Mrs. Brown sought to cancel these instruments were: (1) absence of consideration (2) lack of mental capacity (as to the June 13 deed only) (3) fraud, undue influence, duress and coercion.

Appellant generally and specially denied all of the acts of wrongdoing with which he was charged. He offered to pay the vendor's lien notes which Mrs. Brown had released. He also pleaded various statutes of limitations, the statute of frauds and the statute of conveyances.

Appellant affirmatively pleaded ratification, estoppel, waiver and res adjudicata as to the June 13, 1956, deed and ratification of the other instruments sought to be cancelled.

He also pleaded good faith improvements and expenditures upon the property.

In the alternative, and without waiving his claim under the instruments involved, appellant alleged the expenditure of $5,400 for appellee's "personal, medical, transportation, and other expenses and benefits," $2,500 cash payment to appellee, an assumption of a $1,000 attorney's fee at her request, and $12,000 in "expenses, care and maintenance of the lands in question." Appellant's prayer was general in form.

The case was tried to a jury which returned a verdict in all respects favorable to appellee, and judgment in accordance therewith, was rendered in her behalf.

Appellant has 143 assignments of error the first 17 of which are first grouped for briefing. They assert error in the failure of the court to grant appellant's motion for an instructed verdict.

This is a tremendous record—848-page statement of facts—many exhibits—396 page transcript—over 400 pages of briefs. We have read the entire statement of facts and will summarize the material testimony and evidence and we will thereafter attempt to answer the specific points.

Mrs. Brown was 71 years of age and Mr. Hooks was 54 years of age when they first met at the Liberty Bi-Centennial Celebration, April 17, 1956. Mrs. Brown was a widow, her husband, Hale Brown, having died in 1954. They had no children.

Mr. Hooks was a widower, having been married three times. He was divorced in 1955, and had not remarried.

Mr. Hooks testified that he had been a successful oil operator and had, at the time of trial, oil income of $350 per month.

On the evening of the day of their meeting Mr. Hooks, accompanied by his mother, took Mrs. Brown to the centennial "Cavalcade," and then took her to her farm home. The next day Mr. Hooks and his mother went back to the farm and brought Mrs. Brown once more to the centennial. Thereafter, appellant paid Mrs. Brown many visits, and about one week after the

centennial closed Mrs. Brown told appellant she would like to sell her place.

In the latter part of May 1956, and about five weeks after the parties met, Mrs. Brown was hospitalized for a serious operation. Mr. Hooks went to see her every day for the two weeks she was retained there. After returning to her home, Mrs. Brown was visited by Mr. Hooks almost every day for at least a week, when Mrs. Brown again broached the sale of her farm, and appellant asked her for a preference to buy it. Shortly thereafter June 13, 1956, deed to the property was made by Mrs. Brown to appellant. The consideration recited in the deed was $10 and other good and valuable considerations and the execution of a $5,000 note payable in ten equal annual installments.

Mr. Hooks made no title examination before his purchase. He stated the full consideration was $7,500, $2,500 in cash, the $5,000 note and his promise to let Mrs. Brown live on the property for her life and his promise to care for her.

Mr. Hooks testified that the $2,500 cash was paid by him in cash to Mrs. Brown but that she gave it, or most of it, back to him so that he could improve the place. We quote from appellant's testimony:

"Q. This $2500.00, when you would give it to her and she would give it back, are you counting that as part of the purchase price when you say you paid a fair price? A. That's right.

"Q. You are counting that? A. That's right.

"Q. Even though the money made its way back into your pocket? A. Yes.

"Q. You knew Mrs. Brown was an old widow, didn't you? A. That's right.

"Q. And you knew that she had been sick for years, taking medicines, didn't you? A. No, I didn't know that at that time.

"Q. But you knew she was sick. A. Yeah.

"Q. And didn't it make you feel the least bit bad taking that money back from her? A. Well, she wanted to improve around the house and clean up the thickets that was around the place to where the wild cats and the fox and stuff wouldn't come up and catch her chickens.

"Q. Yes, but you already had a deed to the property. A. That's right.

"Q. And it was improvements on your property? A. I didn't say that I was going to go in there and clean that up right then, and she said, 'Let's go ahead and clean it up because the animals is eating my chickens all up.'

"Q. Then she was putting improvements on your property with her money. Is that right? A. That's right.

"Q. Didn't that kind of shock your conscience to let this poor old lady do that for you? A. Well, if she wanted to do it, it was her money, she could do whatever she wanted to with it.

"Q. And so you let her do that? A. That's right."

None of the $500 annual notes was paid to Mrs. Brown, although Mr. Hooks testified that he had agreed to pay $1,000, or two of the note obligations, as attorneys' fees to attorneys employed by Mrs. Brown to defend a suit brought against her and Mr. Hooks by Jack Speights.

The Speights' suit was brought to cancel the deed from appellee to Mr. Hooks and to construe the will of Hale Brown, deceased, husband of appellee. While this suit was pending in the Beaumont Court of Civil Appeals Mrs. Brown filed an affidavit in that Court affirming the deed from herself to appellant. On this occasion she was accompanied to Beaumont by appellant.

Under the mutual probated will of Mrs. Brown and her deceased husband, Hale

Brown, Jack Speights and his wife, Margaret, were to receive all of the unexpended estates of Mr. and Mrs. Brown at the death of the survivor, subject to $500 bequests to their nephew and niece, Price Whittock and Mrs. Elsie Marsh.

Mr. Hooks testified that the bill of sale to the cattle and the household goods was made to him by Mrs. Brown who, according to appellant, stated "She said she wanted to do that so there wouldn't be no argument among Hale Brown's nephews and nieces."

No consideration was paid for these transfers and the bill of sale was not filed for record until two or three years after its delivery.

Some of the cattle were sold by appellant and he retained the proceeds.

Concerning some of the improvements which appellant testified to having made on the Brown farm he, appellant, gave the following testimony:

"Q. In those law suits you were contending, when Jack Speights was questioning your title, you contended that those improvements were for the benefit of Mrs. Brown's cattle, didn't you? A. No, not exactly.

"Q. Oh, you didn't make those contentions. Well, what did you say? A. All the improvements was for Mrs. Brown's cattle.

"Q. They were for her cattle. A. We had it where that she would get a portion if she needed it.

"Q. Did you have any written agreement on that? A. No.

"Q. That was just your word? A. That is my word."

In March 1959, appellant took Mrs. Brown to Hamilton, Texas, where appellant's lawyers were to prepare his income tax. While there Mrs. Brown executed a release of the $5,000 vendor's lien note which appellant had executed in part pay-

ment for the farm. Regarding this transaction appellant testified:

"Q. Then had you ever paid her those $500.00 notes? A. No, she was satisfied with what she was getting. She said if she was to die she didn't want that note to hang over me to where that Hale Brown's nephews and nieces would be suing me.

"Q. In other words, she just gave you this release of those notes? A. Yes, and she said I could pay it along as I could and if she was to happen to die, why I would have this release on hand to show that it was paid in full.

"Q. In other words, she gave you the release on the notes and then you all agreed that you could go ahead and pay them out as you could, right? A. That's right.

"Q. Was that a written agreement? A. No.

＊　　＊　　＊　　＊　　＊　　＊

"Q. What did you mean taking that release from her for that $5,000.00 in notes when all in the world you have done for her is bought her a few dollars' worth of clothes and a few groceries, according to your testimony, and that was part of the agreement to begin with. A. I know it.

"Q. Didn't you feel bad about taking that release from her? A. If she wanted to fix it to where Mr. Hale Brown's nephews and nieces wouldn't be a suing me if she was to happen to drop out, why I figured—

"Q. All the more power to her. A. If it was her wishes to do that, it was all right with me."

This release was not recorded until January, 1960.

For about a year from the Fall of 1956, appellant took Mrs. Brown from the farm to spend the night at Daisetta where Mr. Hooks and his mother lived. The three of

them then moved to the farm where they lived until the Spring of 1960. Mrs. Brown received a monthly old age pension of $61.90 from 1954 (or before) until May 1959, some of which, at least, was spent in caring for herself.

While living at the farm with appellant and his 82 year old ill mother, Mrs. Brown did the cooking and helped care for appellant's mother.

Appellant testified that he paid the grocery bill of about $65 or $70 per month, and that he had bought Mrs. Brown some clothes.

Regarding these services, appellant testified:

"Q. Well, don't you think the value of her services in cooking and all that, was worth at least as much as the money you spent on her for food and groceries; utilities, and so forth? A. Well, it could be.

"Q. Probably is far greater, isn't it Frank? Don't you think it is well worth more than what you have spent on her? A. Well, it could be."

Appellee, Mrs. Brown, testified that the property in suit was all the property she and her husband had accumulated during their 47 years of marriage.

Mrs. Brown testified that she had been under a doctor's care for about 15 years; that she had high blood pressure and took "nerve medicine." A Negro couple lived on the farm with Mrs. Brown and helped care for her and the farm. She and her late husband in 1951 had given this couple a lifetime lease on 8 acres of the farm. The lease was filed for record in August 1956.

Mrs. Brown testified that appellant first mentioned buying her farm on the second day after she first met him. She detailed the attentions which he paid her, and we quote her testimony regarding the deed:

"Q. Mrs. Brown, state whether or not he made some promises to you in order to get you to sign that deed. A. Well, he promised to marry me and said that we would go to Kountz and get married and we would tack our marriage license up on the wall where everybody could see it. And later he told me that he couldn't marry me because that I was going to have a re-occurrence, the doctor said, of that cancer.

"Q. He told you he wasn't going to marry you after he got the deed, didn't he? A. That's right."

At the time of making the deed Mrs. Brown said she was "too sick to think." She also related protestations of love by appellant for her, and stated that she believed them and the promise of marriage.

Mrs. Brown stated she gave the bill of sale to the household goods and cattle because she was afraid of appellant.

Mrs. Brown had testified to other troubles and litigation she was having when she signed the quitclaim deed which she now seeks cancelled, and we quote the following from her testimony:

"Q. Do you remember signing some papers in connection with that partition? A. No, I don't.

"Q. You don't remember that. Do you remember it happened? A. I remember it happened but, you know, they just told me about it but I didn't know what was in it or didn't know the quit claim deed was in there, or anything about it.

"Q. That does look like your signature, however? A. Yes, that's right.

"Q. State whether or not about this time you were signing a lot of papers. A. I was signing so many till I didn't know what I was signing.

"Q. Why were you signing all those papers? A. It was because, like I tell you, I just wanted to keep peace and quietness and I just went along with Frank, done what he said to do, because he was tore up and mad half the time, and shooting and a going around there, and I just was afraid not to and especially after he had thrown a chair at me and had cussed me and told me he was going to send me to the pen, and there was a gate, if I didn't like it. Naturally I was afraid.

"Q. Now, you were afraid of him, though, even before he did that? A. Yes, I was afraid of him before then."

Regarding the release of the vendor's lien note, Mrs. Brown stated that she signed it for the same reason that she signed the other papers appellant asked her to sign, that she was afraid of him because he had already threatened to send her to the penitentiary and to "beat hell out of me, he said, before he sent me."

Mrs. Brown testified that appellant had given her $180 in money; that he paid most of the grocery bill and bought her some clothes; that she spent part of her pension money to take care of herself and part on things for the house.

Mrs. Brown was cross examined at length. Her testimony is rational and intelligent. She testified that her farm was run down and repairs and improvements were needed; that she had asked Mr. Jack Speights to help install a bathroom, but she had to use her oil lease money to obtain it. She told Mr. Hooks:

"A. Well, I just told him that I had to have something done; I had to have some work done on the place, and that I was not quite certain, with the way Jack was doing. He was supposed to come out there and do some work, and do things around there for me, and he wasn't doing it, and I was going to have to make some kind of change. But I said I can't do it because the

place is willed, and he said Alfred had promised to take me to see Judge Matthews to see if I could sell it and everytime we went in, Judge Matthews was in Court, and then I got sick and I couldn't go.

\*   \*   \*   \*   \*   \*

"Q. So you had been considering making a sale before you met Mr. Hooks. A. Well, I hadn't really considered making a sale but I knew that I had to have some work done and somebody had to help me.

\*   \*   \*   \*   \*   \*

"Q. But you did tell Frank, here, that you were going to have to do something because Jack was not doing anything for you, isn't that right? A. Well, I think Frank asked me if Jack was doing anything for me and I said not too much; that I had to have something done. My fences were all down and I was sick; I was lonely."

Mrs. Brown testified that Mr. Hooks found her unconscious at her home and took her to the hospital. This was shortly after they became acquainted.

Mrs. Brown testified that while she was in the hospital Jack Speights came to see her and warned her that she had better watch Frank Hooks "because he was pretty shrewd."

Jack Speights had tried to buy the farm before Mr. Brown's death and had offered $3,500 for it.

Mrs. Brown, by deposition in this case, testified:

"Q. Well, how long did that condition take—that condition when you couldn't think right? A. Well, I guess *for a couple of three weeks, anyway*, after I came home.

\*   \*   \*   \*   \*   \*

"Q. How soon was it, after your operation, that you got to attending to your own business, or how long was it

after the operation? A. Well, I will say three weeks."

In person, on the trial, Mrs. Brown testified she did not remember about the deposition.

Further from this deposition this testimony of Mrs. Brown was offered regarding the $500 payment on the $5,000 vendor's lien note which she gave to appellant:

"Q. And the truth of the matter is, that at that time, you gave it to him of own free will, did you not? A. Yes.

"Q. Your answer is yes? A. Yes.

"Q. Now, I take it there was a change in your feeling about him later on, and that at a later time, you wished you had not given him the receipt? A. That's right.

* * * * * *
"Q. I'm not talking about whether you changed your mind later. I'm talking about at that time. A. At that time, I will say I gave it to him in good faith.

"Q. All right. And actually, he wasn't holding any gun on you? A. No, he wasn't holding any gun on me.

"Q. Or threatening you in any way? A. No."

Mrs. Brown, in this deposition, also testified that she wished she had not given appellant the deed to the farm, that she reached this opinion about two years before this trial. Her explanation follows:

"Q. What happened to bring that on? A. Well, he began to get so violent, and he had all the neighbors mad at me, and they wouldn't come about me. I didn't have any friends; I was losing them every day. And he didn't want me to see anybody, and he was mad at Ambers all the time. Ambers couldn't come there, and they had several big quarrels, and he threatened to burn their house down, and do all this, that, and the other. And that kept me all upset, all the time, because I didn't know—we hadn't ever had any trouble, Mr. Brown and I. We lived there in peace, but I sure didn't do it after that.

"Q. Now, you are talking about two years after your trade with Frank Hooks, weren't you, because at the time of this deposition you were indicating about two years ago when he had the trouble with Ambus. A. I imagine so. I just don't remember. There was so much going on, so many depositions, and so much to go through.

* * * * * *
"Q. Well, anyway, you placed the date as to when you began to get dissatisfied with your trade with Mr. Hooks, you placed the date of that as the time when he had the difficulty with Ambus, didn't you? A. That's right.

"Q. That's when the trouble started. Isn't that right? A. Well, not exactly because after Frank come and told me that he couldn't marry me because the doctor had said that I was not going to live but six months because there was going to be a re-occurrence of this cancer, which the doctor told me I didn't have, there was no malignancy there, and I didn't think that Frank was telling the truth and I still don't.

"Q. Well, of course—A. And I just felt that he was just trying to gyp me out of my place, and he just promised to marry me, and I still feel that way, that that was his excuse to marry me because he had told others that he wasn't going to marry that old woman she was old enough to be his grandmother.

* * * * * *
"Q. Now, Mrs. Brown, now that we understand what I am asking you about. Isn't it true that on that deposition that you said that the three things that

caused you to become dissatisfied with your trade with Frank were these:

"First, that you began losing all your friends? A. That's right.

"Q. Second, the trouble that Frank had with Ambus? A. That's right.

"Q. And third, he criticized you for riding Mrs. Hooks? A. That's right.

"Q. And you said that there was the three things that caused you to become dissatisfied with your deal with him. A. Well, yes.

\*   \*   \*   \*   \*   \*

"Q. Did he tell you he was going to marry you before you went to the hospital? A. No.

"Q. Did you talk about getting married before you went in the hospital? A. No.

"Q. Let me ask you this. Did you take seriously that promise about him marrying you? Or did you think that was—A. I didn't know. I didn't know Frank then.

"Q. Did you care particularly? A. I didn't care particularly, because in the first place I knew I was too old for Frank.

"Q. In other words, you never placed any great store in that part of it? A. No.

"Q. Even when you signed the deed, you weren't paying too much attention about whether he promised to marry you or not? A. No.

"Q. As I understand it, you did place some store about his promise to build a separate house? A. I sure did.

"Q. And, of course, you did expect him to pay you the money? A. Yes.

"Q. Is that right? A. That's right.

"Q. And that was your expectations at the time you signed the deed? A. That's right."

Mrs. Brown, after denying that she was under the influence of drugs or that she was influenced by appellant's promise of marriage testified, by deposition, that in making the deed to appellant she was only influenced by his promise to build a house and pay the consideration.

Mrs. Brown further testified:

"Q. Now, Mrs. Brown, after you became dissatisfied with your trade with Frank, did you tell him that you would like for him to leave and give you the deed back to your place? A. I told him he had better deed that place back to me so that I could get a lease on it and that I could get my old age pension, because he was flat broke and I was too.

"Q. And, so, you say you did tell him that he had better deed it back to you? A. That's right, and he said, 'Well, where would I be if I done that?'

\*   \*   \*   \*   \*   \*

"Q. As a matter of fact, you didn't let on to Frank about being dissatisfied because you just hated to tell him, isn't that right? A. Well, Yes, I didn't say too much because I was afraid to say too much because he had already threatened me and I just kept still. And then after his mother broke her leg, well, I knew that I still had a heart, and I was duty bound to stay and help take care of her.

"Q. Well, how long was she down with a broken leg? A. Well, she was down about three months.

"Q. That was in February, March and April of 1959? A. That's right.

"Q. And this time when you say that Frank threw the chair at you occurred after Mrs. Hooks broke her hip, did it not? A. That was before.

"Q. It was before? A. That was the night before he was put under that peace bond.

\*   \*   \*   \*   \*   \*

"Q. Now, Mrs. Brown, what I was leading up to is this: When you signed that bill of sale, you intended to give it to Frank, didn't you? I mean you intended to give it to him? A. Of the cattle you mean?

"Q. Yes, ma'am. A. Well, I went along with him, just like I told you, all the time because I didn't want to have any disturbance, and I was trying to keep peace, trying to be quiet there because that is the way Mr. Brown and I lived. We didn't have an enemy in the world that I knew of, and that is all we had, was peace and quietness there.

"Q. As I understand it, you and Frank were on good terms, I believe you said, when you gave him this birthday release in March of 1957. A. Well, we wasn't fighting or anything like that, but I just—he said he would like—I said what do you want for your birthday or Christmas, or whatever it was, and he said, 'Just sign one of those notes.'"

When questioned again about the June 13, 1956 deed, Mrs. Brown testified:

"Q. But you did intend for Frank to get title to the property, didn't you? A. Well, he just kept on and kept on until—and he even come to my bed when I was in the hospital, when I was just desperately sick and said, 'Will you please give me a deed to that place when you get home?' And I said, 'Frank, I am too sick to talk about it.' And then when I got home, well, he started again.

"Q. All right. But, anyway, you intended to give him title to your property. A. Well, I did do it whether I intended to or not."

By deposition she testified:

"Q. The deed you gave Frank Hooks to the land, did you convey all the land that you owned to him? A. Yes, everything I owned.

"Q. What was the consideration? A. It was Seventy-five Hundred Dollars ($7500.00), Twenty-five Hundred Dollars ($2500.00) in cash, or he could go ahead and fix up the place, which he has done—built all new fences and built a stock pen—which would amount to the same thing.

"Q. As I understand, he agreed to give you $7500.00, composed of $2500.00 cash, or do certain work on the place? A. Yes.

"Q. And that work was done after you gave him the deed, or was supposed to be done after you signed the deed to him? A. Yes.

"Q. And he never did give you $2500 in cash? A. But he has done three or four thousand dollars worth of work there.

"Q. But that was after you deeded him the land? A. Yes.

"Q. And do you consider the land is his or that the land is yours? A. I consider it every bit his.

"Q. And the services he rendered on the fixing up of the place is to his, Frank Hooks' benefit? A. Not to his any more than mine. I was losing all my cattle. Not only that, he put in butane gas and an electric heater, which I needed so badly.

"Q. When you signed the deed to him, you signed the deed to all the improvements located on the land? A. Yes.

\* \* \* \* \* \*

"Q. That was a correct statement of your trade with Frank, was it not? A. Other than what he told me. He said, 'Now, you deed me the place and we'll go fifty-fifty on everything' which we did not do because he didn't pay me for anything. He didn't pay me for the calves he sold, he didn't pay me for the place, the Seventy-Five Hundred Dollars. Of course, he did put the Twen-

ty-Five Hundred Dollars, I imagine it cost that much on the fences, but I say that he didn't live up to his agreement because he was supposed to pay me Five Hundred Dollars yearly in notes and one is all he ever paid me. That is, he didn't pay it, I signed the note for his birthday or Christmas, or something. I don't know. I asked him what he wanted and he said, 'Just sign that note.'

"Q. All right. In connection with that part about the fifty-fifty agreement, I will read this from Mr. Wheat's questions:

" 'Q. You are not fifty-fifty with him? A. No, sir.

" 'Q. You haven't told anybody you were fifty-fifty? A. No, sir.' "

A letter from Mrs. Brown to Mr. Hooks written by her in June 1959 while she was visiting in Iowa, was friendly and endearing in terms.

On redirect examination Mrs. Brown denied that she was unconscious when Mr. Hooks found her on the day she was taken to the hospital.

Mr. Albert Elkins, a neighbor of Mrs. Brown, testified that while talking with Mrs. Brown and Mr. Hooks at the farm about ten days after Mrs. Brown came home from the hospital, they both told him they were going to get married, and that Mrs. Brown was going to deed him the farm because it was the only way to break the will of Hale Brown and Mrs. Brown.

Ambus Mosely, who with his wife, Melet, lived on the Brown farm, testified that he had heard Mr. Hooks and Mrs. Brown talk about marriage shortly after she returned from the hospital. Mrs. Mosely testified that Mr. Hooks told her of their marriage plans and that he requested her to cook the wedding cake:

"Q. Did he tell you what kind of wedding cake he wanted? A. Yes, sir,

said he wanted a big high one and wanted it decorated with a pair of love birds on it."

Mr. Magus F. Smith, an attorney, testified that he had talked with Mrs. Brown in connection with his representation of Mrs. Brown and Mr. Hooks in the Speights case and that she had told him that she and Mr. Hooks had never talked of marriage.

Mr. Smith also testified that he talked with Dr. DeLaney regarding the mental condition of Mrs. Brown and that he had stated "that there was nothing wrong with her mind; she was perfectly all right and knew what she was doing."

Dr. A. L. DeLaney, a highly qualified doctor of medicine who resides in Liberty, testified that Mrs. Brown had been a patient of his since 1949. He stated that Mrs. Brown was a nervous person; that her blood pressure was high; that she had chronic uremia; that she had arteriolosclerosis; that she constantly took barbiturates. He testified:

"Q. I will ask you whether or not a 65 year old woman who constantly has high blood pressure and is constantly taking these barbiturates, whether or not that has any effect on the brain over a period of years? A. Yes, sir.

"Q. What effect does it have on the brain, Doctor? A. Chronic use or continued use of this stuff is liable to cause mental deterioration with emotional instability and lack of ability to concentrate or to think things through.

\*　　\*　　\*　　\*　　\*　　\*

"Q. I will ask you whether or not chronic uremia has any effect upon the brain. A. Yes, sir.

"Q. I will ask you whether or not it creates any permanent damage to the brain? A. Most of the time.

"Q. I will ask you whether or not you have any opinion in this case as to

whether or not there was any damage to the brain brought about by the chronic uremia so far as Mrs. Brown is concerned. A. I am going to have to qualify that in this respect, that the uremia, coupled with the high blood pressure, the two together, probably more than either one separately were the things that caused the fogging of her mentality.

"Q. Fogging of her mentality? A. Yes.

"Q. I will ask you whether or not in your opinion as early as June of 1955, had she developed a fogging of her mentality? A. Yes, I think so.

"Q. I will ask you whether or not that was a permanent condition, Doctor. A. Well, I think it is obtained up until the present.

"Q. Therefore, in June of 1956 she had a fogging of her mentality? A. Yes.

\*    \*    \*    \*    \*    \*

"Q. I will ask you whether or not as early as the early part of June of 1956 you found any evidence of senile dementia in Mrs. Brown? Is this fogging that you are talking about, is that some evidence of one of the forms of senile dementia? A. Yes, that is one of the principal symptoms of it, but here we have an overlay of high blood pressure; a chronic uremic state due to this tone in the kidneys, which keeps it from functioning and throwing off the usual toxic as it should; she is also on barbiturates; she is not a young woman. So it would be very difficult to say just which one of these was the principal factor, but certainly, all of of them together would cause the definite symptoms of what is known as senile dementia or, well, that is the best term for it.

"Q. Did that condition exist as early as June of 1956? A. Well, her hyper-

tension was there, the uremia was there then, and the barbiturates were there, so I don't know whether the senile dementia was actually working then or not, but she certainly was not a real rational person at times.

"Q. Now, you are not telling this jury that she is insane, are you, Doctor? A. No. She is just getting where she doesn't think well.

"Q. She wasn't insane, but could you describe it as a feebleminded individual or weakminded, or how would you describe it in 1956? A. She was just an old lady that was confused, and, constitutionally, she wasn't prepared to meet the world. She had lost her husband and she just was sort of groping around aimlessly. That was the way she impressed me.

"Q. I will ask you whether or not that condition has continued down until the present? A. Yes, sir.

"Q. Is it getting any better? A. No, sir.

\*    \*    \*    \*    \*    \*

"Q. Describe arteriolosclerosis to the jury, please, sir. A. This is a disease of the blood vessels in which the arteries which are usually soft and elastic become hardened so that less blood goes through them and, therefore, the different parts of the body are nourished less than they require. It is usually a progressive disease.

"Q. What effect does that have on the brain and functioning of the brain? A. Well, it varies a great deal in the different people, but the usual thing is, oh, they become more or less childish, they can be easily talked into things.

"Q. By that you mean that she is easily led into things by the flatterer and is easily influenced. A. I would think so."

Dr. DeLaney also testified that Mrs. Brown had told him of her coming mar-

riage to Mr. Hooks and that she "was quite elated over it." That a few weeks later she told him that Mr. Hooks would not marry her and that she "reminded me of some kind you take some candy away from."

Dr. DeLaney testified that Mrs. Brown did not have cancer.

Mr. Hooks on examination by his own counsel, testified at great length about the improvements and repairs he had made on the farm and their cost. He further testified that Mrs. Brown did not object to the making of these improvements.

There is testimony, however, that Mrs. Brown advised him not to go forward with the improvements until after the Speights' suit was settled.

Mrs. Brown signed, as a witness, a mortgage which Mr. Hooks gave the First State Bank of Liberty on some of the cattle transferred by her to appellant. She stated she did not remember this occasion and that she did not, thereby, intend to ratify the Bill of Sale.

There is also testimony that the farm, without improvements, was worth $125 per acre in June 1956.

The name at the farm gate now reads "W. F. Hooks."

The jury found:

(1) Mrs. Brown did not possess mental capacity on June 13, 1956, the date of the deed.

(2) That she signed such deed as a result of undue influence exercised on her by appellant.

(3) That before she signed such deed, appellant had promised to marry her; that at such time he did not intend to keep such promise; that such deed was signed in reliance on such promise and that such promise was a material inducement to such act.

(4) That the Bill of Sale (July 25, 1956) was signed by Mrs. Brown as a result of undue influence and duress exercised on her by appellant. Similar findings were made as to the transfer of the cattle brand.

(5) That she signed the quitclaim November 5, 1956 deed without knowledge and intent on her part to execute and deliver it. Relevant findings of undue influence and duress were also made regarding this instrument.

(6) That the release of the vendor's lien was brought by the exercise of duress and undue influence by appellant on her.

(7) Appellant had sold cattle belonging to appellee of the value of $2,491, which he appropriated to his own use and benefit.

(8) That the rental value of the farm to appellant and his mother from June 13, 1956 to the date of trial was $3,000.

(9) That the execution of the affidavit by Mrs. Brown and filing it in the Court of Civil Appeals at Beaumont, the release of the vendor's lien note, the execution of the quitclaim deed did not constitute ratification of the June 13, 1956 deed.

(10) That the signing of a chattel mortgage as a witness, the mortgage being made by appellant to the First State Bank of Liberty, did not ratify the Bill of Sale of July 25, 1956.

While appellant has grouped the first seventeen points for briefing, we find it impossible to make a general disposition of them. Accordingly, we will separately decide them.

■ The first point that there is no evidence that appellant's promise of marriage was a material inducement to the execution of the deed is overruled. To us, the record reveals that marriage and the love and protection of a husband was uppermost in the mind of appellee.

■ Point two is that, as a matter of law, appellee ratified the June 13 deed. The Court, on this phase of the case instructed the jury:

"You are instructed that by the term 'ratification' or 'ratified' as used in this charge, is meant voluntary acts and conduct of a person with full knowledge of the right of said person not to be bound by a previous transaction or instrument to which said person is a party and with the full intent of said person to accept, agree to and be bound by all of the material terms of said previous transaction or instrument. However, the term 'ratification' or 'ratified' shall not include acts or conducts done or instruments signed, brought about or caused to be brought about by duress, undue influence, or done without possessing mental capacity, as the terms 'duress', 'undue influence', and 'mental capacity', are herein defined to you.

"You are instructed that by the term 'duress' as used in this charge is meant any coercion of another, either mental, physical or otherwise, causing her to act contrary to her own free will or to submit to a situation or condition against her own volition or interest."

Under this charge and the evidence relating thereto, it is our opinion that ratification was not established as a matter of law.

■■ We overrule point three which is that appellee was guilty of laches as a matter of law depriving her of the remedy of cancellation of the deed of June 13. Laches is an equitable doctrine and cannot be used to reward inequitable conduct, nor to defeat justice. Equity, 30 C.J.S. Equity § 115.

■ Point four to the effect that appellee has waived her right, as a matter of law, to cancel this deed is also overruled.

■ Point five is to the same effect as points three and four but is specific in asserting that in permitting appellant to make valuable improvements estops her to invoke the remedy of cancellation. We will later discuss the right of appellant to recover for his improvements. We here hold that, under the evidence, estoppel was not established as a matter of law.

■ Point six is that the affidavit filed in the Court of Civil Appeals at Beaumont constitutes ratification of the June 13 deed as a matter of law. We overrule this contention, holding that only a fact issue is presented.

. ■ Point seven is that appellee was not entitled to recover, as a matter of law, because she has not offered to return the consideration she received for the June 13 deed and has not offered to do equity.

Appellee received no consideration for this deed except the expenditure of the $2,-500 down payment in improving the property which belonged to appellant. This amount is in substantially the same amount found by the jury to be due appellee for conversion of her cattle. Appellee, in her petition, offered "to do such equity in this case as the court may direct."

We overrule this point as a matter of law, and will later dispose of the equities.

Point eight is that ratification of the other instruments sought to be cancelled is shown as a matter of law. We hold that only fact issues were presented.

■ Point nine is that there is no evidence of duress causing execution of the June 13 deed. We hold that there is evidence of duress. Point ten makes the same point as to evidence of undue influence, and our ruling is the same.

Point eleven is that there is no evidence of lack of mental capacity to execute the June 13 deed. We overrule this point and refer to 10 Tex.Jur.2d, Cancellation of Instruments, Sec. 9, p. 312, for a statement of the rules and principles followed by us in evaluating the evidence on this issue.

Point twelve is that cancellation of the June 13 deed on the ground of failure to

pay and make agreed improvements was disproved and hence cancellation was not justified. This point is overruled for the reason that there were other grounds alleged for cancellation.

Point thirteen is a combination of several points which we have discussed, except perhaps with reference to performance of appellant's agreement to take care of Mrs. Brown.

This agreement was not in the deed. It is issuable also, we believe, that appellant has taken care of Mrs. Brown. He attended to her physical wants, but through his conduct she lost the companionship of her friends and neighbors and consequently her happiness. The point is overruled.

Point fourteen is that the breach of promise to marry as a ground for cancellation is barred by the four year statute of limitation.

■ This suit was for cancellation of a deed dated June 13, 1956, and for cancellation of instruments subsequently executed. It was filed March 4, 1960. Grounds for cancellation based on the breach of promise to marry were not pleaded until August 15, 1960. The cause of action, cancellation of such deed, remained the same, only additional grounds were alleged. It is our opinion that the cause of action not being barred the grounds sustaining it are not barred. It is the accrual of the cause of action which fixes the time for limitation to commence, not the date of the evidence by which the cause of action may be established. The point is overruled.

■ Point fifteen is that this cause of action is barred by Art. 5524, Vernon's Ann.Civ.St., barring actions for breach of promise to marry if not brought within one year after accrual of cause of action. This is not a suit for breach of promise to marry. The point is overruled.

Point Sixteen is that the cause of action to cancel the Bill of Sale dated July 25, 1956, is barred by the four year statute of limitation.

■ This point is overruled. Cancellation of the Bill of Sale on the grounds of fraud and undue influence was first alleged in appellee's Second Amended Original Petition filed July 8, 1960.

The seventeenth point is a combination of the various acts of appellee relied on to constitute ratification of the instruments sought to be cancelled and asserting lack of evidence to support any pleaded ground for cancellation. Having passed on and overruled the several matters separately, we overrule this point.

Appellant's points eighteen through forty-five are jointly briefed.

These points all relate to the Court's action in overruling appellant's motion for judgment notwithstanding the verdict. The evidence to be considered and the particular points made are the same as considered by us in disposing of the preceding points except regarding the findings of the jury relative to the rental value of the farm and the value of the cattle converted by appellants. We will, therefore, overrule, in the same manner and without discussion, all of these points except as noted.

One of the points relating to the conversion of the cattle is that the right, if any, to recover for such conversion is barred by the two years statute of limitation. All that appellant says regarding this plea is: " * * * whatever claim she may have otherwise had, for rental value or for the value of the calves which were sold by the Appellant with her consent, was was either barred by limitation or never came into existence."

Appellee states in her brief, and our reading of the statement of facts confirms such statement, that "We have searched the record and there is no evidence establishing that such sales (of cattle) were made prior or over two years before the filing"

of this suit or the last amended pleading of appellee.

It is our opinion that appellant has not discharged his burden in this respect.

■ Appellee did consent to appellant borrowing money on the cattle from the Liberty Bank. We cannot construe this consent to authorize or justify conversion of these cattle.

We will later discuss appellee's right to recover for the rental value of the farm during appellant's residence there.

Appellant's points forty-six through ninety are jointly briefed. These points complain of the Court's failure to submit to the jury appellant's requested special issues and instructions, and in overruling certain objections to the charge.

We quote his general description of such points:

"These points of error, just enumerated, complain of the failure of the court to submit instructions to the jury, and special issues, embodying the principles discussed at the outset of this brief under the points of error numbers one through eighteen. In other words, it was the contention of the Appellant, as demonstrated by his pleadings and his request for special issues and for special instructions, that he had been induced to make valuable improvements upon the premises in question, and to advance money to the Appellee, and to render services for the Appellee and to expend money in the care of the cattle in question, in reliance upon certain acts and conduct on the part of the Appellee such as her appearances before the representatives of the Texas Department of Public Welfare, and various other officials, ratifying and confirming her agreement with the Appellant, and never at any time repudiating her agreement with him."

We will reply, in kind, to the general presentation of these assignments called points.

The issue of ratification of the instruments appellee sought to cancel was submitted to the jury with the instructions previously noted. It was not required, in our opinion, that the essence of these instructions be submitted to the jury under a name different from ratification, such as "waiver." This term was defined in the charge as follows:

"You are instructed that by the term 'waiver' or 'waived', as used in this charge, is meant the intentional relinquishment of a known right. It is a voluntary act and implies an election to dispense with something of value or to forego some advantage which might have been demanded and insisted upon. However, the term 'waiver' or 'waived', shall not include acts or conducts done or instruments signed, brought about or caused to be brought about by duress, or undue influence, or done without possessing mental capacity, as the terms 'duress', 'undue influence', and 'mental capacity' are herein defined to you."

■ The basic elements of ratification and waiver are hence stated to be knowledge and voluntary, intentional choice exercised in the light of such knowledge. These elements, regardless of name, having been submitted to the jury for guidance in answering issues as to ratification, were properly denied application to similar issues of waiver.

Discussion of the question of improvements made by appellant on the farm will be made later herein.

■ Points ninety-one through one hundred are jointly briefed. We copy appellant's statement of the contents of these points:

"Over the objection of the Appellant, the Appellee offered extensive testi-

mony with reference to suits filed by the defendant against other persons, and suits filed by other persons against the appellant, which had no relevance to the issues in this case. Also extensive evidence was offered as to the altercations and disputes between the Negro on the place who cursed the Appellant, and who had the Appellant placed under a peace bond. Also, over the objection of the Appellant, a certain ground lease to Ambus Mosely and his wife by the plaintiff and her deceased husband was placed in the record, for no purpose other than sentimental reasons. Also, there was testimony offered as to certain proceedings in the Justice Court at Devers, Texas, and also highly prejudicial testimony about attempts by the Appellant to secure the aid of Ambus Mosely in behalf of the Appellee to give testimony to the effect that she had held adverse possession of an adjacent tract of land consisting of some eight hundred acres, not in issue in this suit. Also, there was highly prejudicial testimony about alleged attempts on the part of the Appellant to suppress evidence in another suit."

The evidence shows that Ambus and Melet Mosely were given a lifetime lease on eight acres of the Brown farm by Mr. and Mrs. Brown; that they were faithful longtime employees of the Browns; that the Mosely's were Negroes; that in return for this lease they were to take care of Mrs. Brown after Mr. Brown's death. This they did until appellant moved to the farm.

The record also discloses that the June 13, 1956 deed contained a description considered sufficient to include 800 acres of land adjacent to the Brown farm. That after appellant obtained title to the Brown farm he and appellee brought suit against the owners of the 800 acres to recover title to it. This suit was based on adverse possession.

Appellant tried to persuade Ambus to give false testimony in this suit, to the effect that Mr. Brown claimed the land as his own, and he refused. This caused bad feelings between appellant and Ambus, the result of which was that appellant was placed under a peace bond in a Justice Court proceeding.

Mrs. Brown testified that she did not participate in this suit of her own free will but because she was afraid of appellant.

Mrs. Brown gave similar testimony with reference to a suit she filed in August 1956 against B. M. Ragan and others alleging a conspiracy which resulted in her being forced to sell her farm at a sacrificial price. This suit was filed by one of appellant's attorneys. Appellant testified in it.

We believe this evidence was admissible on the issue of undue influence. These incidents and transactions were all close enough in point of time to the making of the instruments sought to be set aside as to be material in establishing the character and extent of control which appellant exercised over Mrs. Brown and the means he employed in so doing. They aid in proving that Mrs. Brown was a mere pawn in his hand. His desire, good or evil, was her command. This evidence also tends to prove that Mrs. Brown was a person who could be easily, unduly and wrongfully influenced.

By referring to the analogous problem in the law of wills we find that "In determining the question of undue influence, all facts and circumstances must be taken into consideration." [1]

Evidence of the physical and mental condition of the person alleged to have been influenced is admissible.[2] Also admissible is evidence of the conduct of the person accused of exercising undue influence after the execution of the instrument in question if such evidence tends to show

1. 94 C.J.S. Wills § 224 p. 1073.

348 S.W.2d—8½

2. Id., § 233, p. 1082.

an effort to keep its maker under control.[3]

It has also been stated that in cases such as this "the facts will be closely scrutinized and weight given to slight circumstances of imposition or circumvention." [4]

■ Point one hundred and one complains of the failure of the Trial Court to grant appellant's motion for continuance. The basis of this motion was the serious illness of his mother.

A motion for continuance on this ground had been previously granted appellant, and in the meantime his mother's deposition had been taken. It was shown that the health of appellant's mother was not likely to greatly improve and that to wait on the restoration of her good health would amount to an indefinite postponement of the trial of the case.

It is our opinion that no abuse of discretion of the trial judge in this respect is shown.

■ Appellant, in point one hundred and two, complains of the Trial Court's refusal to grant his motion for continuance based on the absence of the witness Mrs. Gladys Baillio, a case worker for the Department of Public Welfare.

Mrs. Baillio was not served with subpoena because she was ill in a hospital. The parties in open court agreed to take the deposition of Mrs. Baillio in order to avoid a continuance. The deposition was taken and offered in evidence by appellant. The Trial Court found that appellant had waived his motion for continuance even though he was not fully satisfied with the result of the deposition.

We hold that no abuse of discretion by the Trial Judge is shown. Although appellant did not obtain the records he sought from Mrs. Baillio because she did not have

them with her, he did obtain an official summary of their contents. Mrs. Baillio who was the case worker and who obtained the information from which this summary was made testified that the summary appeared to be correct.

■ Appellant by point one hundred and three complains of the failure of the Court to grant him a new trial because of newly discovered evidence. This evidence consisted of various receipts for moneys expended by appellant in appellee's behalf and included three receipts, each for $500 which appellant testified were signed by Mrs. Brown, as payment on the $5,000 farm note. Appellant testified that he found these receipts in his home in Daisetta.

The receipts showing payment on the $5,000 note would impeach appellant's testimony that he had paid none of them.

These receipts were material, but we think they were merely cumulative evidence since Mrs. Brown signed a release reciting full payment of the $5,000 note. In our opinion, no error under this point is shown.

■ We overrule point one hundred and four complaining of the admission of evidence as to the market value of the farm for the reason that inadequacy of price or consideration is some evidence tending to show undue influence. 10 Tex.Jur.2d p. 351. Point one hundred six is to the same effect and is overruled.

Points one hundred five, seven and eight relate to admission of evidence of the rental value of the farm.

We have concluded that recovery of rental value of the farm under the circumstances of this case is inequitable, hence it is not necessary to pass on these points. We will state our reasons for this holding later herein.

3. Id., § 250, p. 1120. This authority also states that evidence of bad character of such person is also admissible. Appellant herein offered evidence of his own good character.

4. 10 Tex.Jur.2d p. 351.

Point one hundred nine is that appellant should have been granted a mistrial because appellant while on the witness stand was asked:

"Q. Here you are, a big oil man making all this oil money, taking gifts from an old widow."

He answered: "That is right."

The Court, on objection being made after the question was asked and answered, instructed the jury not to consider the question or answer.

Appellant had testified that he was a successful oil man, and we conclude that reversible error under Rule 434, Texas Rules of Civil Procedure is not shown.

By point one hundred ten appellant complains of the following jury argument made by attorneys for appellee in referring to appellant:

"A man who ran around with the Goldust Twins from McAllen and Huntington, Texas, his cohorts whom he owns oil and gas leases with and had been conniving, litigating and stirring up strife for a long time."

The following argument is also the subject of complaint:

"You have asked 'where was Jack Speights?' Jack Speights was in the Veteran's Hospital with a stroke himself, during the time that Frank Hooks was over here beginning his perpetration of this unlawful scheme to obtain this property.

\* \* \* \* \* \*

"If you can stop to think when you lay down at night or any citizen in this county lays down to think that he doesn't have any children to, to think that his poor widow woman is going to be the prey of a walking goldigger such as the defendant in this case. Thank God some of our mothers do have sons to take care of them and to protect them from the goldiggers in their old age when they get senile dementia.

\* \* \* \* \* \*

"But, along came Mr. Spider, going to work on the fly and to spin his web, and he comes along and says, 'I am going to marry you, you are going to give me a deed to your place, I am going to pay you $2500 in cash and give you a note for $5000.'"

Also complaint was made of this argument relating to the Ambus Mosely matter:

"And then after he got the trade, on top of that, then, 'I am going to run off your old family retainers because they won't testify for me and tell lies.'

\* \* \* \* \* \*

"That state of affairs got so bad until finally they had to put him under a peace bond. Do you think that Judge Callahan and those good white folks down there at Devers would have sided in with Ambus if Ambus hadn't been right? As against this white man? Does that speak very good for this white man? Doesn't that fit in with this scheme of his to show the blackness of his heart?"

Also complaint to the following argument relating to the Hale Brown will was made:

"Hale Brown thought he was leaving things in good shape, land that he and Miss Maude bought and acquired, that they worked hard to get and I am sure that Mr. Hale would turn over in his grave not one time but fifteen times if he knew what a fraud had been perpetrated upon his good wife."

There was evidence of prior litigation by appellant conducted by his former (not present) attorneys, and appellee's counsel were entitled to fairly comment on this and related evidence. Their deductions may not have been correct, but we believe they were not so unwarranted as to constitute reversible error under Rule 434, T.R.C.P.

The argument relating to Jack Speights was withdrawn and the jury instructed to disregard it. We believe that this erroneous argument was cured by the Court's instruction.

It is our opinion that the remaining argument complained of was nothing more than a fair comment on the evidence, but if not, that it is not reversible error under Rule 434, T.R.C.P.

Point one hundred eleven presents the following: While appellant was being questioned regarding the other lawsuits mentioned in the record, this incident occurred:

" 'Q. And you had something to do with all of them didn't you? A. I have been in every one of them, I have been the main billy goat in the whole business.

" 'Q. Well, I think we can agree that you are at least a goat.'

"Whereupon the Defendant's counsel made a motion out of the presence of the jury, and whereupon Mr. Zbranek, the counsel who was questioning Defendant said:

" 'I will withdraw my agreement that he was a goat.'

"Whereupon the Court said:

" 'Ladies and gentlemen of the jury, disregard the statement of counsel, Mr. Zbranek, when he used the statement, "I will agree with you that you are a goat." Dismiss that from your mind just as though you had never heard it. Dismiss it from your mind as far as having anything to do with any issues in this lawsuit which I will submit to you for your determination.'

"And Mr. Zbranek said:

" 'I am sorry, Your Honor.' "

There is nothing of a reversible nature in this occurrence under Rule 434, T.R.C.P.

Point one hundred twelve relating to the admissibility of evidence relating to other lawsuits has been previously discussed and decided.

Point one hundred thirteen complains of the cross examination of appellant regarding the Speights' suit brought against him and appellee to cancel the June 13 deed. Appellant was contending that appellee's actions in that case constituted a ratification of the June 13 deed.

The cross examination complained of was with regard to the nature of the Speights' suit. Appellant apparently assumed in her questioning that the suit was for the purpose of restoring the farm to her. This was incorrect as the suit seems to have been brought primarily for the benefit of the plaintiffs in that case. The petition in that suit was in evidence and whatever erroneous impression was created by such cross examination was subject to easy clarification. We hold that reversible error under Rule 434, T.R.C.P., is not here shown.

Point one hundred fourteen complains of the cross examination of appellant with reference to his former testimony without laying a proper predicate. We will not set forth the details of this matter as, in view of the great latitude in cross examination of a party, reversible error could not be predicated solely on this method of cross examination.

Point one hundred fifteen raises the admissibility of the Hale Brown will. Mrs. Brown thought she could not sell the farm because of this will. Appellant through his attorneys convinced her that the will was not to be so construed.

This will tends to explain the basis of the Speights' suit which appellant injected into the case upon his plea of ratification. We hold the will to have been properly admitted in evidence.

This ruling disposes of point one hundred sixteen which complains of the admission in evidence of expert testimony construing the effect of the Hale Brown will.

■ Point one hundred seventeen complains of admitting evidence: "* * * concerning irrelevant and immaterial matters such as interfering with conversations with other people, altercations with other people, gun play, and trouble with Ambus Mosely, a peace bond and an alleged attempt to suppress testimony in another case not related to the issues in the case at bar, and between other parties."

This point is largely a reiteration of points previously stated and decided. In addition to such holdings, we further state that none of the matters referred to in this point are of sufficient gravity to warrant reversal under Rule 434, T.R.C.P., even though there may have been error committed as assigned.

■ Point one hundred eighteen is that the Trial Judge erred in not disqualifying himself. This point is overruled.

The alleged grounds of disqualifications are that the Judge had recused himself as presiding judge in the Speights' case and that he had drawn, as an attorney, the Hale Brown will.

The Speights' case and the Hale Brown will are only collaterally involved in this case. In fact, appellant has a point complaining of the admission in evidence of the will.

Art. 5, Sec. 11, Texas Constitution, Vernon's Ann.St., provides, in part, that no judge shall sit in any case "when he shall have been counsel in the case." [5] Judge Matthews has never been counsel in this case. He was not disqualified, and he properly refused to surrender his responsibility in this case.

■ Points one hundred nineteen and twenty relate to the order quashing a subpoena duces tecum directed to representatives of the Texas Department of Public Welfare.

The subpoenas quashed are not in the record but in the motion to quash filed by the Honorable Will Wilson, Attorney General of Texas, it is recited that:

"The documents, papers, records, files, and communications of the Welfare Department sought in this cause are confidential in nature as such disclosure of this information is prohibited by Section 33, Article 695c, Vernon's Civil Statutes.

"Second: This litigation is between private individuals, the purpose of which is not connected with the administration of general assistance, Old Age Assistance, Aid to the Blind, or Aid to Dependent Children or in any manner connected with the Welfare Department or its administrative procedures."

We believe quashing these subpoenas was proper under and in keeping with Sec. 33(1) of Art. 695c, which provides in part:

"It shall be unlawful, except for purposes directly connected with the administration of (various welfare programs) for any person * * * to * * * receive, make use of * * * any information concerning, persons applying for or receiving such assistance, directly or indirectly derived from the records, papers, files, or communications of the State Department or subdivisions or agencies thereof * * *."

For appellant to receive and make use of the records sought by him would violate this statute. The Court only prevented him from performing an illegal act.

There was, of course, no error in refusing to permit appellant to obtain the forbidden records through the medium of preparing a bill of exceptions.

■ Appellant has grouped his remaining points, one hundred twenty one through

5. Other constitutional grounds of disqualification are not urged.

one hundred forty three for briefing. These points assign error to the Court's charge in (a) definition of "undue influence", "duress", "waiver" and "ratification", (b) to any charge on mental incapacity because of lack of evidence (c) to the manner in which the issues of mental capacity and undue influence were submitted (d) because of no evidence of reliance on marriage promise (e) no evidence of number of calves sold by appellant for his exclusive benefit (f) misplaced burden of proof on issues of mental capacity, undue influence and duress.

The no evidence points will not be discussed as they are not briefed under these points.

None of these points complain that any issue was duplicitous.

We have quoted from the charge the definition of "waiver" and "ratification", and here refer to such definitions. The definition of "undue influence" in the charge follows:

"You are instructed that by the term 'undue influence' as used in this charge is meant any fraudulent or designing means employed upon and with the maker of an instrument by which, under the circumstances and conditions by which such maker was surrounded she could not well resist and which controlled her volition and induced her to do that which otherwise she would not have done.

"To constitute undue influence it is not necessary that any overt act or acts of influence be exerted at the very time the instrument is executed, but is necessary that through the existence of an influence previously exerted and which is operating upon the maker at the very time the instrument is executed, her free agency at that time is destroyed and an instrument results which does not represent the wishes of maker but represents the wishes of the person exercising the influence.

"You are further advised that not every influence exerted by one person over the mind of another may be classed as undue influence. Persuasion, entreaty, importunity, argument, intercession, and solicitation are permissible and do not constitute undue influence unless they subverted and overthrew the will and caused the doing of something that the person subjected thereto did not desire to do."

The special issues about which appellant here complains, and of which the following are examples, are as follows:

"Special Issue No. 1: Do you find from a preponderance of the evidence that at the time Maude Brown signed the purported deed dated June 13, 1956, that she did not possess mental capacity as that term is defined to you below?
"Answer 'She did not' or 'She did'.

"Answer: She did not."

"By the term 'mental capacity' is meant that the person making the deed must at the time the deed is executed, have sufficient ability to understand the business in which she is engaged, the effect of her acts in making the deed, the capacity to know the objects of said deed and any claims of the Grantee upon her and the general nature of the property described in said deed.

"Special Issue No. 2: Do you find, from a preponderance of the evidence, that Maude Brown, at the time she signed the deed of June 13, 1956, was caused to do so by the exercise of undue influence, as that term is herein defined, upon her by the Defendant, W. F. Hooks?

"Answer 'We do' or 'We do not'.

"Answer: We do."

"Special Issue No. 8: Do you find, from a preponderance of the evidence,

that the Plaintiff, Maude Brown, at the time she signed the Bill of Sale on July 25, 1956, was caused to do so by the exercise of duress, as that term is herein defined, upon her by the Defendant, W. F. Hooks?

"Answer 'We do' or 'We do not'.

"Answer: We do."

"Special Issue No. 21: Do you find from a preponderance of the evidence that in signing the Affidavit of September 24, 1959, and filed with the Court of Civil Appeals at Beaumont in the Jack Speights case, the Plaintiff ratified her Deed to W. F. Hooks of June 13, 1956?

"Answer 'Yes' or 'No'.

"Answer: No."

It is our opinion that the objections to the Court's charge, as reflected by these points, are not well taken.

■ The burden of proof on the issues of ratification was properly placed on appellant. Texas Law of Evidence, McCormick and Ray, 2d Ed. Vol. 1, Sec. 43, Stanolind Oil & Gas Co. v. Midas Oil Co., 143 S.W.2d 138, Austin Civil Appeals, writ ref.

The Court's definition of "ratification" was substantially correct. It embraces the elements of ratification. See Wells v. Houston, 29 Tex.Civ.App. 619, 69 S.W. 183, San Antonio Civil Appeals, writ ref.

The Court's definition of "duress" was substantially correct. See Hailey v. Fenner & Beane, 246 S.W. 412, Dallas Civil Appeals, 10 Tex.Jur.2d p. 344.

The Court's definition of "undue influence" was substantially correct. Stribling v. Stribling, 85 S.W.2d 315, Austin Civil Appeals, writ dism., Browning v. Nesting, 219 S.W.2d 712, San Antonio Civil Appeals, writ ref., N.R.E.

The Court's definition of "mental capacity" was substantially correct. See 10 Tex. Jur.2d p. 312.

We believe this case was properly and fairly submitted to the jury, and we overrule the points under consideration.

We now come to a discussion and disposition of what we believe to be the real merits of this appeal, the adjustment of equities between the parties.

The pleading of appellee in this respect was inadequate, however, it appears from the facts developed on the trial that she was in no position to make other than a general offer to do equity, which she did. She could make no specific offer because she had nothing to offer.

■ When this trial commenced, Mrs. Brown had lost her home and farm, her household goods, her livestock, her notes received for the farm, her pension and her friends, all as a result of appellant's machinations. This situation was, in our opinion, sufficient to excuse Mrs. Brown from making more specific her offer to do equity or from making tender. Then, too, the major items for which appellant seeks payment are for improvements made on the farm. Since Mrs. Brown is without funds, the only method of securing payment for these improvements would be to create a lien on the farm with the probable result that Mrs. Brown would ultimately lose what this suit was primarily brought to recover —the farm.

■ When we speak of improvements, we have reference to the improvements made as part of the consideration which appellant agreed to pay for the farm. This amount was $2,500, and was in lieu of the recited cash payment in that amount.

We are satisfied that appellant is not entitled to reimbursement for any other improvements made on the farm. A claim for good faith improvements cannot be predicated on a fraudulent transaction. 23 Tex. Jur. p. 390. The same text p. 394, states that improvements to land during pendency of suit involving its title are not regarded as having been made in good faith. This

statement is applicable here to improvements made after Speights brought his suit.

Mrs. Brown testified that she desired to give appellant credit for what he had done. This is a commendable attitude for her to take and is in keeping with sound equitable principles, and we respect it as to the improvements made as consideration for the deed. As stated, we would not permit this allowance to jeopardize appellee's farm. We simply allow this claim of appellant, $2500, to be offset against the judgment which Mrs. Brown obtained against him for $2,491 for conversion of her calves. The small difference in these amounts is de minimis.

■ We have indicated above that recovery of rental value of the farm is inequitable. Appellant's occupancy of the farm was in the performance of his oral obligation to take care of Mrs. Brown. It was in the nature of consideration. During this period the farm was utilized for the benefit of appellant, his mother, Mrs. Brown and her cattle. Appellant received no special benefit from possession. Mrs. Brown did not object to appellant or his mother being there, and she accepted the services of appellant in caring for the place.

We apologize for both the quantity and quality of this opinion. We will not extend it further by a discussion of the law upon which we have adjusted the equities between the parties, the substance of which is that so far as possible and reasonable, the parties should, in suits for rescission, be restored to their former status. These principles are fully expounded in 10 Tex.Jur.2d, Cancellation of Instruments, Secs. 43–53, to which we refer.

The judgment of the Trial Court is reformed by eliminating therefrom the recovery of $5,491, with interest, by appellee from appellant.

We assess the costs of appeal ⅗ths against appellant, ⅖ths against appellee.

The judgment of the Trial Court, as reformed, is affirmed.

Reformed and as reformed, affirmed.